**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DIANE OFFEREINS, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.** |
| | ) | |
| DISCOVER FINANCIAL SERVICES, | ) | |
| a Delaware corporation, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Diane Offereins ("Plaintiff" or "Ms. Offereins"), by and through her attorneys, for her Complaint against Defendant Discover Financial Services ("Discover" or "the Company"), alleges as follows:

## NATURE OF THIS ACTION

1.      Ms. Offereins brings this action against Discover for breach of the implied covenant of good faith and fair dealing, and for gender and age discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Equal Pay Act of 1963 ("EPA"), the Age Discrimination in Employment Act of 1967 ("ADEA"), and the Illinois Human Rights Act ("IHRA"). These claims are brought in response to Discover's callous attempts to deprive Ms. Offereins of her hard-earned equity awards after 25 years of valuable and acclaimed service to the Company.

2.      Discover is a digital banking and payment services company with one of the most recognizable brands in U.S. financial services. It is also one of the largest credit card issuers

in the country. After a long and successful career at Discover, Ms. Offereins retired in June 2023 with nothing but high praise from the Company, both publicly and in private. She was so highly regarded, in fact, that shortly after she left an award was named for her, recognizing the Discover network's top partner.

3.      Prior to her retirement, the Company had initiated a long-running internal investigation, led by outside counsel, into potential misclassification of certain non-commercial credit cards into a commercial tier that charged merchants a higher interchange fee on transactions. The potential misclassification at the heart of the investigation was well-known within the Company; it related to a practice that began *before* Ms. Offereins was put in charge of running Discover's payments network and one that the Company had been actively discussing since at least 2017. These issues were well-known within all divisions of the Company for years, up to and including the CEO and the Board of Directors.

4.      Ms. Offereins fully cooperated with the investigation. Days after her retirement, she was interviewed by outside counsel—an interview that lasted less than 3 hours. Neither Discover nor its counsel had any follow-up inquires for Ms. Offereins concerning her interview.

5.      At the end of 2023 and in January 2024, Discover, arbitrarily and without any clearly articulated basis, exercised provisions in its compensation plan to cancel Ms. Offereins's unvested awards of Discover stock. It did so under the guise of "misconduct," but that could not be further from the truth. To justify its actions, Discover pointed to the purported result of Discover's findings from the internal investigation. In reality, this was a convenient, pretextual excuse for Discover to exercise its discretion arbitrarily and to discriminate against Ms. Offereins.

6.      Indeed, no one at Discover ever suggested to Ms. Offereins that she was even

suspected of misconduct in connection with the investigation. Nor could they have. She was not responsible for the classification of cards; she had repeatedly raised concerns about the classification issues; and she had advocated for ways to change it. To be sure, the first suggestion of any wrongdoing came after she asked why her equity had been cancelled and was told that the Company was exercising its discretionary provisions to cancel her unvested equity.

7.      The timing of Discover's decision to cancel Ms. Offereins's equity—coming literally the night before her shares were to vest and six months after her retirement from the Company—belies Discover's true intentions. Despite not being responsible for the issues identified in the investigation, Ms. Offereins lost her unvested equity because she was a convenient scapegoat for the card misclassification issue. She was the only woman and the only retired Discover executive committee member to lose equity as a result of the investigation. It is no coincidence that she lost more equity as a percentage of her total received equity than anyone else, including the Company's former Chief Executive Officer.

8.      Ms. Offereins brings this action to recover the equity that Discover appropriated from her in an arbitrary and discriminatory manner.

## **PARTIES**

9.      Plaintiff Ms. Offereins is a resident of Lake County, Illinois.

10.     At all relevant times, Ms. Offereins was an "employee" of Discover within the meaning of the relevant statutes.

11.     Ms. Offereins is a 66 year-old woman who retired from Discover after faithfully serving as a senior executive at the Company for 25 years.

12.     Defendant Discover Financial Services is a Delaware corporation with its headquarters and principal place of business in Riverwoods, Illinois. At all relevant times,

Discover was and is engaged in an industry that affects commerce and is an "employer" within the meaning of the relevant statutes.

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. §§ 1331, 1343, this Court has subject matter jurisdiction over Ms. Offereins's federal legal claims brought under Title VII of the Civil Rights Act of 1964, § 42 U.S.C. 2000e *et seq.*, the Equal Pay Act of 1963, 29 U.S.C. § 206, and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*

14.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental subject matter jurisdiction over Ms. Offereins's state law claims under the IHRA, as the state law claims are related to Ms. Offereins's federal law claims under Title VII, the EPA, and the ADEA and are part of the same case or controversy under Article III of the United States Constitution.

15.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because Discover's principal place of business is in this District and a substantial portion of the events giving rise to Ms. Offereins's claims occurred in this District.

16.     All conditions precedent to jurisdiction have occurred or been complied with.

17.     On June 13, 2024, Ms. Offereins timely filed a Charge of Discrimination under Title VII and the ADEA with the Equal Employment Opportunity Commission ("EEOC"), EEOC Charge Number 440-2024-09178. The EEOC Charge of Discrimination was cross-filed with the Illinois Department of Human Rights ("IDHR").

18.     On June 20, 2024, the EEOC issued Ms. Offereins a Notice of Right to Sue, which entitles Ms. Offereins to initiate a civil action under federal law within ninety (90) days of receipt. The Notice of Right to Sue is attached as Exhibit A.

19.     On July 15, 2024, Ms. Offereins served a written request on the IDHR within

thirty (30) days of the EEOC's Notice of Right to Sue, asking the IDHR to adopt the EEOC's findings on the cross-filed charge, Charge Number 2024CR2617.

20.     On August 6, 2024, the IDHR issued Ms. Offereins a Notice of Dismissal and Closure, which entitles Ms. Offereins to initiate a civil action in the appropriate state circuit court within ninety (90) days after receipt. The Notice of Dismissal and Closure is attached as Exhibit B.

21.     Ms. Offereins has fulfilled all conditions precedent to the institution of this lawsuit.

**FACTUAL ALLEGATIONS**

### I.     MS. OFFEREINS WAS A VALUED AND SUCCESSFUL DISCOVER EXECUTIVE FOR 25 YEARS

22.     Prior to joining Discover in 1998, Ms. Offereins had a successful career working in the financial industry for nearly twenty years at Southeast Bank, Bank of America, and MBNA, Inc.

23.     Ms. Offereins was recruited to Discover in 1998 to serve as its Chief Information Officer by its then-President and COO, David Nelms, with whom she had worked at MBNA, Inc.

24.     As Chief Information Officer, Ms. Offereins was responsible for all technology at the Company. She successfully transformed outdated infrastructure and legacy platforms into strategic business resources. As a member of the Executive Committee, Ms. Offereins joined the top echelon of executive management and played an essential role in Discover's success. She served in that role until 2009.

25.     While serving as Discover's Chief Information Officer, Ms. Offereins played an important role in two critical moments in its development as a successful financial services

company. First, when Discover purchased the Pulse electronic funds transfer network in 2005, Ms. Offereins was asked to add managing that business to her responsibilities as Chief Information Officer. Second, Ms. Offereins was involved in Discover's separation from its parent company, Morgan Stanley, in 2006, setting the Company up for its ultimately successful IPO.

26. Finally, in 2008, Discover purchased Diners Club and its three distinct payment brands—Discover, Pulse, and Diners Club—necessitated a global, unified payments business. Ms. Offereins was asked to lead that business and in 2009, she moved into the role of Executive Vice President and President of Payment Services. In that role, Ms. Offereins managed more than $300 billion in payments volume annually. She developed key relationships necessary for Discover's success in the emerging commerce landscape, partnering with major players such as Apple, Google, PayPal and Ariba.

27. Over the course of 15 years leading Discover's global payments network, Ms. Offereins built the network into what it is today, a standalone payments network accepted at over 70 million merchants in more than 200 countries and territories.

28. Discover's payments network is the Company's core financial asset, as evidenced by Capital One Financial Corporation's recent decision to purchase Discover. While Capital One is acquiring both Discover's payments network and banking businesses, the network was the big draw for Discover's acquirer. Capital One's CEO was quoted in the press release announcing the acquisition, stating that the acquisition would allow the two companies to "build a payments network that can compete with the largest payments networks and payments companies." The press release also touts Discover's "rare and valuable global payments network," calling it a "key foundation in Capital One's quest to build a global

payments company."

29.     In other words, Ms. Offereins spent the last 15 years of her career at Discover building a payments network that attracted Capital One to purchase the Company in a tremendously valuable transaction for Discover shareholders.

30.     Before, during, and after her tenure at Discover, Ms. Offereins has remained an active member of organizations focused on women's leadership, including the Committee of 200, the International Women's Foundation, and The Chicago Network.

31.     Ms. Offereins has earned numerous accolades for her formidable presence and contributions in the industry. From 2008 to 2022, Ms. Offereins received a recurring distinction in American Banker's "Most Powerful Women in Banking & Finance." In 2014, she received Womenetics's "POW! Award." From 2014 to 2016, Ms. Offereins was deemed one of PaymentsSource's "Most Influential Women in Payments."

32.     Ms. Offereins intended to retire from Discover in 2018, when David Nelms retired as CEO and was replaced by Roger Hochschild. But Ms. Offereins agreed to stay on for a short period to support the transition to the new CEO. Ultimately, her time at Discover was extended by another three years due to the COVID-19 pandemic.

33.     On March 9, 2023, Discover issued a press release announcing that Ms. Offereins would retire from Discover at the end of June 2023. Discover applauded Ms. Offereins's invaluable contributions after more than 25 years with the Company, recognizing that Ms. Offereins "helped lead Discover's transition to an independent, publicly traded company in 2007 and its acquisition of PULSE and Diners Club International."

34.     Discover CEO Roger Hochschild similarly lauded Ms. Offereins's critical role in the Company's growth and development: "Under Diane's leadership of our Payments

business, we successfully expanded into debit and established a global payments network. . . She has built a lasting legacy at Discover as well as a talented team of leaders throughout which is enabling a smooth succession."

35.     Unsurprisingly, Discover boasted of and accepted accolades for Ms. Offereins's impressive accomplishments as a trailblazing woman in finance, including that she was named "one of the Most Powerful Women in Finance by American Banker for the last 15 consecutive years." Discover noted that Ms. Offereins "has long advocated for the advancement of women, both within Discover, and externally where she has served as a member and Chair of the Chicago Network, an organization committed to empowering women."

36.     Upon Ms. Offereins's retirement, Discover's payments business created a new award named for Ms. Offereins honoring its Partner of the Year. Discover's first Diane Offereins Award was presented by Ms. Offereins at a recent global Discover conference in Dubai.

## II.     DISCOVER'S OMNIBUS INCENTIVE PLAN DESCRIBES THE CIRCUMSTANCES UNDER WHICH THE COMPANY MAY CANCEL UNVESTED SHARES

37.     At all times relevant to this Complaint, Ms. Offereins was eligible to participate in Discover's Amended and Restated 2014 Omnibus Incentive Plan (the "Plan"). The purposes of the Plan were "(i) to attract, retain and motivate employees, (ii) to compensate employees for their contributions to the growth and profits of the Company, and (iii) to encourage employees to own Company stock."

38.     The Plan was administered by the Compensation and Leadership Committee of the Board (the "Committee"). The Committee had exclusive discretion to select eligible

employees under the Plan and grant awards that include, but are not limited to, Restricted Stock Units ("RSUs") and Performance Stock Units ("PSUs").

39.     According to the Plan, RSUs are "a right to receive a specified number of Common Shares" in Discover, subject to certain terms and conditions, upon the expiration of a restriction or vesting period. A PSU is a type of RSU awarded based on a multiplier determined by the Company's performance on certain benchmarks. Each award of PSUs or RSUs was memorialized by an accompanying certificate that set forth the terms and conditions of the award (an "Award Certificate").

40.     Under the Plan, the Committee granted Ms. Offereins RSUs and PSUs in 2021, 2022, and 2023, which constituted part of her incentive compensation in each year. Each award was accompanied by an Award Certificate describing the terms and conditions under which Ms. Offereins was granted the award under the Plan. The Award Certificates for Ms. Offereins's 2021, 2022, and 2023 RSU and PSU awards detailed the following Scheduled Vesting Dates for the awards:

| YEAR | STOCK UNIT | AMOUNT | SCHEDULED VESTING DATE |
|---|---|---|---|
| 2021 | PSU | 14,534 | February 1, 2024 |
|  | RSU | 9,690 | February 1, 2022<br>February 1, 2023<br>February 1, 2024 |
| 2022 | PSU | 11,008 | February 1, 2025 |
|  | RSU | 7,339 | February 1, 2023<br>February 1, 2024<br>February 1, 2025 |
|  | RSU | 8,064 | February 1, 2023<br>February 1, 2024<br>February 1, 2025 |

| YEAR | STOCK UNIT | AMOUNT | SCHEDULED VESTING DATE |
|------|-----------|--------|------------------------|
| 2023 | PSU[1] | 12,331 | February 1, 2026 |
| | RSU | 8,221 | February 1, 2024<br>February 1, 2025<br>February 1, 2026 |

41.     A portion of Ms. Offereins's 2022 equity awards was—as described in Discover's 2023 proxy statement—a $1,000,000 stock award bonus granted to Ms. Offereins "in recognition of her leadership" for an early investment Discover made to acquire 5.4% of the card payment processing company, Marqeta. When Marqeta went public in June 2021, Discover's stake in the company was publicly reported to be worth almost $800,000,000. Ms. Offereins was responsible for making that investment and was rewarded with a separate equity grant from her ordinary equity compensation.

42.     While each Award Certificate listed Scheduled Vesting Dates in February, Ms. Offereins's RSU equity awards with February 1, 2023 scheduled vesting dates would vest on January 1, 2024 because of the timing of her retirement in mid-2023. Ms. Offereins's PSU equity awards would vest over time, depending on the specifics of Discover's performance benchmarks.

43.     Additionally, each Award Certificate contained a clawback provision, which required the recipient to forfeit vested or unvested PSUs and RSUs "[i]n the event and to the extent the Committee reasonably determines that the performance considered by the Committee, and on the basis of which the [PSUs/RSUs] were granted or converted to Shares, was based on Discover's material noncompliance with any financial reporting requirement . . . which requires Discover to file a restatement of its financial statements."

---

[1] Because the Award Certificates for each tranche of stock units are substantially similar, copies of Ms. Offereins's 2023 PSU and RSU Award Certificates are attached as Exhibits C and D, respectively.

44.     The clawback provision only allowed the Company to recover vested or unvested equity in an amount proportional to the size of the restated financials. As a result, the largest possible clawback for conduct that caused only a small restatement of Discover's earnings would be very minimal.

45.     Separate from the clawback provision, each Award Certificate also included a "Risk Review" provision. This section of the Award Certificates details the Company's process and assessment for determining whether the award recipient "engaged in any willful or reckless violation of the Company's risk policies." Based on the assessment, "the Company may determine that all or a portion of [the recipients PSUs and/or RSUs] will be forfeited." Unlike the clawback provision, the "Risk Review" provision applied only to unvested RSUs and PSUs; after RSUs and PSUs turned into ordinary Discover stock, the only option Discover had to recover vested equity awards was the proportional clawback for conduct leading to misstated earnings.

46.     The Risk Review provision is similar for both PSUs and RSUs. Ms. Offereins's 2023 Award Certificate for RSUs, for instance, details that "no RSUs will convert to Shares until the Chief Human Resources & Administrative Officer receives confirmation from the Chief Risk Officer, or their delegate, that a review has been completed by the Chief Risk Officer, or their delegate." The same process holds for PSUs, with the only minor distinction being that "no PSUs will convert to Shares until . . . the Committee certifies the extent to which the performance criteria set for set forth in this Award Certificate have been satisfied."

47.     According to the language of the Risk Review provision of the Award Certificates, the Company has two levels of discretion in deciding to cancel equity awards. First, the Chief Risk Officer must "determine whether [the employee] engaged in any willful

or reckless violation of the Company's risk policies." After that determination is made, "then the Company *may* determine that all or a portion of [the employee's RSUs/PSUs] will be forfeited" (emphasis added).

48.     On information and belief, after the Chief Risk Officer makes an initial determination that an employee has engaged in a willful or reckless violation of the Company's risk policies, the ultimate decision of whether and to what extent to cancel RSUs or PSUs is made by the Company's Internal Committee on Risk Management ("ICRM"). The ICRM is a management committee at Discover and does not ordinarily include members of the Board of Directors. The Chief Risk Officer sits on the ICRM.

49.     While the Award Certificates state that the risk review decision of the Chief Risk Officer is separate from the Company's decision (through the ICRM) to forfeit an employee's equity awards, in practice the Chief Risk Officer heavily influences the ICRM such that the ICRM typically rubber stamps the Chief Risk Officer's decisions.

50.     In addition to the provisions providing for the clawback of vested or unvested RSUs and PSUs, and the Risk Review provision applicable only to unvested awards, the Award Certificates also specify circumstances involving "Investigative Holds":

> In the event that the Company has either commenced an investigation of a matter that you oversaw or were involved in or has evidence that may require investigation of a matter that you oversaw or were involved in, in either case concerning a breach of one of the obligations hereunder or a serious violation of Company policy, the Company may freeze your account and effectuate a transfer restriction such that your converted and delivered [PSUs/RSUs] and any [s]hares and dividend equivalents associated therewith may not be sold or transferred ***until such time as the Company reasonably believes the matter to be resolved***. (emphasis added).

III.   **DISCOVER INTERVIEWS MS. OFFEREINS IN AN INTERNAL INVESTIGATION AND, SIX MONTHS LATER, ARBITRARILY CANCELS HER UNVESTED EQUITY**

A.   **Ms. Offereins Was Interviewed in Connection With Project Simple**

51.   In June 2023, Discover's outside counsel contacted Ms. Offereins about setting up an interview to discuss an internal review that had begun in the first quarter of 2023. Ms. Offereins was interviewed by Discover's outside counsel on July 11, 2023, a few days after her formal retirement from the Company. The interview lasted just under three hours.

52.   At that time, there was substantial external pressure on Discover regarding the issue of how Discover had misclassified certain credit cards issued to individuals as "commercial" credit cards for which merchants had to pay a higher interchange fee. As Discover stated when it publicly announced the card misclassification issue, the incorrect treatment of these cards began "around mid-2007," two years before Ms. Offereins moved into her role on the payments network side of Discover. The term "Project Simple" had been used for efforts to address the issues since as early as 2017, reflecting the fact that efforts to remediate the problem pre-date the internal investigation for which Ms. Offereins was interviewed in July 2023.

53.   Discover is both a bank that issues payment cards and a network that provides the infrastructure to use those cards. In her role as President of Payment Services, Ms. Offereins oversaw the latter part of Discover's business, while another role, the Executive Vice President and President of U.S. Cards, oversaw the issuance of the cards themselves. Since 2020, the President of U.S. Cards at Discover has been Dan Capozzi. Prior to 2020, the President of U.S. Cards was Julie Loeger.

54.   Ms. Offereins made proactive efforts to address the card misclassification issue

well before Project Simple. This issue was clearly beyond the scope of her duties on the payments network side, as it was Discover's card issuance business that made decisions on how to categorize newly-issued cards. Because Ms. Offereins ran the separate payments network side of Discover, she was limited in what she could do to address the misclassification issue; specifically, she could ask the card side of the business to reclassify the cards, a request that she and members of her team made frequently over the course of her time leading Discover's payments business. Ms. Offereins was involved in discussions to "rebalance" the card classification portfolio as early as 2010. Proposals to fix the card misclassification issue were routinely presented to the most senior leaders of the Company over the course of the 2010s.

55. Ms. Offereins was not the only person with knowledge of the misclassification: this issue was well-known to Discover's senior management for many years, including within the Company's Risk, Legal, and Finance departments.

56. The classification of cards by tiers was also not hidden from merchants who accepted Discover cards at their businesses. Merchants could always see the volume of transactions by tiers and see that a substantial number of Discover cards belonging to individuals were in commercial tiers. Merchants did not complain about this misclassification because merchants focus only on the top-line blended interchange rate that Discover charged. For most of Ms. Offereins's time heading Discover's network, Discover charged a lower blended rate than did Visa and Mastercard as part of its effort to market itself to merchants and grow the network. To this day, Discover's overall blended interchange rate remains competitive with the rates charged by cards on the Visa and Mastercard networks.

57. The card misclassification did not benefit the payments business of Discover.

In fact, it made it more difficult to create new, more specialized card tiers to match equivalent tiers offered by Visa and Mastercard on their networks. In addition, the card misclassification undermined Ms. Offereins's general efforts as head of the network to set competitive and reasonable interchange rates for merchants.

58. Notwithstanding Ms. Offereins's efforts to get Discover's card business to address the problem, it was not ultimately tackled until 2022. Ms. Offereins understands that the problem was always given a lower priority by the card business than other issues because of a general understanding that it did not have a material impact on Discover's revenue.

59. On July 19, 2023, Discover publicly announced that it was discussing the card misclassification issue with its regulators. In its announcement, the Company stated that it "determined that the revenue impact of the incorrect card product classification was not material to the consolidated financial statements of the Company for any of the impacted periods," and announced only marginal changes to the prior quarter's earnings "for go-forward comparative purposes" only.

60. To this day, Project Simple has not caused the Company to restate any financial statements.

61. Ms. Offereins cooperated fully with Discover's internal investigation into the card misclassification issue. To this day, she has not heard from anyone at the Company regarding her interview, whether anyone at Discover has any reason to doubt the veracity of what she told the Company's outside counsel, or whether anyone at Discover has any reason to think that she bore greater responsibility for the card misclassification issue than others in senior management positions. Discover never communicated the outcome of its investigation nor the impact it would have on Ms. Offereins's equity awards.

62.     On information and belief, Discover corrected the card misclassification issue by the fourth quarter of 2023.

**B.     Discover Cancels All of Ms. Offereins's Unvested Equity Awards**

63.     Ms. Offereins's substantial RSUs and PSUs with 2023 Scheduled Vesting Dates were due to vest after December 30, 2023, as were some other RSUs subject to accelerated vesting. However, on January 2, 2024, Ms. Offereins received a letter from Discover's Director of Employee Relations placing all of her unvested equity awards on hold pending Discover's investigation.[2]

64.     The letter referenced Discover's ongoing risk review related to the card misclassification issue and stated that the Company "has not yet made a determination related to [Ms. Offereins's] Awards as required by [the Risk Review provision] of the Award." Because of the Project Simple investigation, the letter stated that Ms. Offereins's RSUs that were scheduled to convert to shares on December 30, 2023 "have not yet converted into Shares pending the completion of the Company's review."

65.     The timing of the Company's decision to place Ms. Offereins's unvested shares into a hold was no accident, nor was the fact that the January 2, 2024 letter specifically referenced that a substantial number of Ms. Offereins's unvested shares had been due to vest at the end of 2023. Had the Company waited another day to place Ms. Offereins's shares into an investigative hold, the first set of her outstanding unvested equity would have vested and Discover would have lost the ability to use its Risk Review provision to cancel her RSUs and PSUs with 2023 Scheduled Vesting Dates.

66.     Ms. Offereins received no further communications detailing the status of the

---

[2] A copy of this letter is attached as Exhibit E.

risk review until she received a letter dated January 31, 2024—the day before the Scheduled Vesting Date of her PSUs vesting in 2024—notifying Ms. Offereins that Discover concluded its risk review:

> A risk review was conducted in connection with the Company's card misclassification matter, and the Chief Risk Officer concluded that you engaged in willful or reckless violation of the Company's risk policies. In consideration of this conclusion, the Board of Directors has determined that one hundred percent (100%) of each of your outstanding [a]wards is forfeited. . . . Accordingly, you will not receive any shares or any other payment with respect to the [f]orfeited [a]wards.[3]

67. Discover provided no evidence or explanation to support the Chief Risk Officer's determination that Ms. Offereins engaged in any "willful or reckless violation of the Company's risk policies." Nor did the Company explain the ICRM's subsequent decision to cancel all of Ms. Offereins's unvested equity.

68. As discussed above, the ICRM is a management committee and does not normally include members of Discover's Board of Directors (the "Board"). However, on information and belief, a member of the Board sat on the ICRM at the time it decided to revoke Ms. Offereins's equity because John Owen, a member of the Board, was serving as interim CEO.

69. In addition, on information and belief, Discover removed Andy Eichfeld, the Chief Human Resources Officer, from the ICRM before it considered forfeiting Ms. Offereins's equity awards because of his objections to the Company's aggressive use of its clawback and forfeiture rights. In addition to serving on the Board and being interim CEO, Mr. Owen also served as acting Head of Human Resources after Mr. Eichfeld was removed.

70. Discover impermissibly imputed "willful or reckless" violations of Discover's risk policies onto Ms. Offereins because she was the only senior executive at the Company

---

[3] A copy of this letter is attached as Exhibit F.

with sufficient unvested equity that could be cancelled by the Company under the Risk Review provision of the Award Certificates. No executive with only or mostly vested equity could be forced to return a large portion of their equity compensation back to the Company in connection with Project Simple: the clawback provision for vested equity would permit the recovery of vested equity only if there had been a restatement of earnings, which there had not been from Project Simple.

71.     Ms. Offereins was an easy target for the risk review: she had recently retired and could not quit in protest or otherwise fight back against a baseless determination that she had acted willfully or recklessly.

72.     The decision by the ICRM, unusually led by the interim CEO and a member of the Board, that Ms. Offereins should lose all of her outstanding unvested equity simply because she had recently retired and was in the best position to have a large amount unvested was unacceptably arbitrary and made in bad faith.

73.     Further, the underlying determination by the Chief Risk Officer that Ms. Offereins engaged in "willful or reckless" misconduct was also wrong and made in bad faith. Ms. Offereins was not responsible for the card issuing business at Discover and that group would have been responsible for remedying the card misclassification issue. Ms. Offereins cooperated with the Company's outside counsel's investigation into the issue. In addition, the details of the card misclassification issue had been reported to the Board since at least 2022, two years prior to Discover's decision to cancel Ms. Offereins's unvested equity, and, on information and belief, the previously separate board of Discover Bank had received presentations about the need to recategorize accounts into different classified tiers many years earlier.

74.     As noted above, Discover stated in its January 2, 2024 letter that it placed Ms. Offereins's unvested RSUs and PSUs into an investigative hold on the *day before* the first set would have vested, strongly suggesting that Ms. Offereins had all of her unvested shares cancelled not because she was culpable for the findings in Project Simple, but because she was a convenient scapegoat: an unrelated and recently retired senior executive who happened to have large tranches of unvested equity due right at the moment that Discover felt it needed to make a show to its regulators of withholding earned equity compensation. The letter to Ms. Offereins stating that all of her unvested shares were forfeited was dated the day before another large set was to vest.

75.     To date, Discover has not provided Ms. Offereins with any information about the procedures that the ICRM followed or failed to follow in cancelling her equity. On information and belief, the ICRM panel that decided to cancel her equity was not provided with the findings from the Board's investigation into Project Simple, which would indicate that she was not responsible for the misclassified cards.

76.     Discover cannot provide a good faith justification for the decisions it made with respect to Ms. Offereins's unvested equity because the reality is that the Company perverted its risk review process to serve unrelated needs: finding a suitable person who was already outside of the Company—no matter how far removed from the card misclassification issue—to take the blame with the regulators and the attendant substantial economic hit.

77.     As of the time that Discover cancelled all of her outstanding equity awards in January 2024, Ms. Offereins had outstanding RSUs in the following amounts: 3,230 granted February 19, 2021; 10,268 granted February 25, 2022; and 4,111 granted February 23, 2023; and (2) outstanding PSUs in the following amounts: 21,801 granted February 19, 2021

(factoring in the 1.5 multiplier as set out in the Award Certificate);[4] 11,008 granted February 25, 2022; and 6,166 granted February 23, 2023.

78.     Those amounts included not only Ms. Offereins's regular equity compensation, but also the one-time bonus of $1,000,000 of Discover stock that Ms. Offereins received in connection with Discover's investment in Marqeta. That investment had no relationship whatsoever to the card misclassification issue, and Discover's cancellation of that bonus award reflects its indiscriminate abuse of its power to forfeit Ms. Offereins's equity.

79.     On information and belief, Ms. Offereins's cancelled unvested RSUs and PSUs, including unpaid accrued dividends on the PSUs, were worth over $7,000,000. The value of those unvested shares has only increased, and they are now worth more than $8,000,000.

80.     Consistent with other Discover executives over the last several years, roughly 60% of Ms. Offereins's compensation was in the form of stock awards. With her stock awards revoked, Ms. Offereins lost the majority of her compensation for 2021, 2022, and 2023: the years during which she led Discover's payments network through the COVID-19 pandemic after she had already planned to retire.

**C.      Discover Treated Ms. Offereins Worse Than Male Executives Bearing Greater Responsibility for the Card Misclassification**

81.     Less than a month after announcing its conversations with regulators, on August 13, 2023, the Board accepted Roger C. Hochschild's resignation as CEO and President of the Company, a member of the Board, and a director and executive of Discover Bank, effective August 14, 2023. On information and belief, the Company asked Mr. Hochschild to

---

[4] The 2022 and 2023 Award Certificates contained similar multipliers which, had Ms. Offereins's shares not been invalidly clawed back, she likely would have received as well.

resign or face termination because of a series of compliance and legal issues, including Project Simple.

82. The Company's Form 8-K, filed on August 14, 2023, detailed that Mr. Hochschild would "continue to be employed by the Company as an advisor to the Chair of the Board from [August 14, 2023] through December 31, 2023, pursuant to the terms of a transition employment letter." Discover included Mr. Hochschild's letter agreement as an exhibit to the Form 8-K. Notably, the letter outlined the agreed-upon terms of Mr. Hochschild's long-term equity awards, including that the Company would cancel only one year of his equity awards:

> You have agreed that, notwithstanding the foregoing, the Company equity awards (e.g. restricted stock units and performance stock units) granted to you during the fiscal year ending December 31, 2023 are cancelled as of the Effective Date and that all obligations of the Company with respect to such awards shall be extinguished at the Effective Date. ***With respect to your continuing Company equity awards, the Company has no intention to exercise its clawback or forfeiture rights on the basis of facts considered by the Board to date including in connection with its review of the incorrect classification of certain credit card accounts or its review of the Company's compliance management system.*** (emphasis added).

83. Notwithstanding the decision that Mr. Hochschild's responsibility for the card misclassification issue required his termination, the Company did not exercise its rights to claw back or otherwise deem forfeited any of his compensation because of its Project Simple investigation or any of the other compliance and legal issues that led the Company to ask Mr. Hochschild to resign.

84. In addition, and as explained above, Ms. Offereins was not involved in the process that initially led to the card misclassification issue that began in 2007 or earlier, and much of her role on the issue was in trying to get leaders of the card side of Discover's business to address the problem.

85.     It is thus notable that Mr. Capozzi, the leader of Discover's card issuance business since 2020, did not lose any equity awards as a result of the Project Simple investigation, based on a review of Discover's most recent comprehensive proxy filing.

86.     In addition to leading Discover's card issuance business for the last four years, Mr. Capozzi served in various Finance roles at Discover from 2007 through 2016, before moving into other roles in Discover's Credit department. On information and belief, Mr. Capozzi was aware of the card misclassification issue before stepping in to lead the card issuance business through his previous roles in Finance.

87.     Mr. Capozzi received a reduced cash bonus for 2023, approximately $150,000 as compared to his previous cash bonus of approximately $1,500,000. On information and belief, this roughly $1,350,000 reduction in Mr. Capozzi's cash bonus was his consequence for his involvement in the Project Simple investigation. That is of course a far smaller cost for Mr. Capozzi to pay than the over $7,000,000 of equity that Ms. Offereins lost, particularly when Mr. Capozzi has been the executive in charge of the unit at Discover that was responsible for the card misclassification for the last four years. In addition, on information and belief, Mr. Capozzi received a larger equity award in 2023 than he did in 2022 to make up for the smaller reduction in his cash bonus due to the Project Simple investigation.

88.     Mr. Hochschild and Mr. Capozzi are far from alone. As mentioned previously, the Company asked Mr. Eichfeld, the Chief Human Resources Officer, to leave within the last year. Mr. Eichfeld was given a severance package that allowed him to leave with all of his equity and an additional two years of pay. And Carlos Minetti, the President of Discover's Consumer Banking division until 2023, was given the same exit package as Mr. Eichfeld, despite a long-running government investigation into Discover's student loan business

(overseen by Mr. Minetti).

89.     It is no coincidence that Ms. Offereins—on information and belief both the only woman and only retired executive committee member to lose equity as a result of Project Simple—lost by far the largest percentage of her equity of any adversely affected employee. There is no non-discriminatory explanation for Ms. Offereins experiencing a larger proportional cancellation of her equity compensation than Mr. Hochschild and Mr. Capozzi.

## CAUSES OF ACTION

**Count I: Breach of Contract (Breach of Implied Covenant of Good Faith and Fair Dealing)**

90.     Plaintiff incorporates Paragraphs 1-89 as though fully stated in this Paragraph.

91.     Ms. Offereins entered into the Plan and Award Certificates with Discover.

92.     The Plan constitutes a valid and enforceable contract.

93.     The 2021 Award Certificate for Restricted Stock Units constitutes a valid and enforceable contract.

94.     The 2022 Award Certificate for Restricted Stock Units constitutes a valid and enforceable contract.

95.     The 2023 Award Certificate for Restricted Stock Units constitutes a valid and enforceable contract.

96.     The 2021 Award Certificate for Performance Stock Units constitutes a valid and enforceable contract.

97.     The 2022 Award Certificate for Performance Stock Units constitutes a valid and enforceable contract.

98.     The 2023 Award Certificate for Performance Stock Units constitutes a valid and enforceable contract.

99.     Ms. Offereins had a reasonable expectation at the time she executed the Plan and Award Certificates that (1) the Company would not make a determination that she engaged in "willful or reckless violations of the Company's risk policies" in bad faith, and (2) that the Company would not decide to cancel her RSU and PSU awards in bad faith.

100.    This term was implied in the Plan and Award Certificates. The Plan and Award Certificates do not specify the Company's duties with respect to determining whether Ms. Offereins engaged in "willful or reckless violations of the Company's risk policies" or whether the Company could cancel Ms. Offereins's unvested RSUs and PSUs under the Risk Review provision.

101.    The Company's decision that Ms. Offereins engaged in "willful or reckless violations of the Company's risk policies" and that her unvested RSUs and PSUs were forfeited as a result was made in bad faith to unjustly enrich the Company.

102.    As a direct and proximate result of the Company's breach of its implied duties not to determine that Ms. Offereins engaged in "willful or reckless violations of the Company's risk policies" in bad faith or to find in bad faith that her unvested RSUs and PSUs were forfeited, Ms. Offereins has suffered, and continues to suffer, damages in an amount to be proven at trial but no less than $8,000,000.

**Count II: Violation of Title VII of the Civil Rights Act of 1964**

103.    Plaintiff incorporates Paragraphs 1-102 as though fully stated in this Paragraph.

104.    Under Title VII, Plaintiff is a member of a protected class on the basis of her gender.

105.    Notwithstanding Ms. Offereins's full cooperation with Discover's Project Simple investigation, Discover decided to deprive Ms. Offereins of her equity awards with no evidence or

explanation. By citing "willful or reckless violation of the Company's risk policies" with no supporting evidence or explanation, Discover believed it could fabricate a facially credible explanation for its otherwise discriminatory conduct.

106. On information and belief, Ms. Offereins is the only woman to lose equity as a result of Project Simple. The Discover executives who were responsible for the card misclassification issue, Mr. Hochschild and Mr. Capozzi, emerged relatively unscathed.

107. While these male executives managed to reap their benefits, Ms. Offereins lost over $7,000,000 in equity awards for an issue she was not responsible for. Discover's actions strongly suggest an agenda of unlawful discrimination.

108. Discover had a statutory duty to conduct and implement its compensation and benefits decisions in a nondiscriminatory manner without regard to gender. Specifically, Discover had a statutory duty to ensure that women, such as Ms. Offereins, were subjected to the same terms and conditions of employment as similarly situated employees who were male.

109. Discover's basis for forfeiting Ms. Offereins's equity awards was false and constituted a pretext for gender discrimination in violation of Title VII.

110. By treating her worse than her male peers with respect to compensation in connection with Project Simple, Discover deprived Ms. Offereins of the rights and privileges enjoyed by similarly situated male executives and all of the benefits and privileges of her contractual relationship with Discover.

111. The discriminatory acts of Defendant, its agents, supervisors, managers, and owners were deliberate, intentional, wanton, and malicious, and were done with malice or with reckless indifference to Plaintiff's federally protected rights until Title VII. The acts complained of were ratified, authorized, or permitted by Defendant and its management, executives, and

owners.

112.    To date, Discover has failed to correct its discriminatory treatment of Ms. Offereins.

113.    Defendant's unlawful conduct in violation of Title VII is outrageous and malicious, intended to injure Plaintiff, and has been done with conscious disregard of Plaintiff's rights under Title VII, entitling her to exemplary and/or punitive damages. Additionally, Plaintiff has and will continue to incur attorneys' fees and costs of litigation as a direct and proximate result of the unlawful, discriminatory conduct as alleged herein.

## Count III: Violation of the Equal Pay Act of 1963

114.    Plaintiff incorporates Paragraphs 1-113 as though fully stated in this Paragraph.

115.    Under the EPA, Plaintiff is a member of a protected class on the basis of her gender.

116.    At all relevant times, Plaintiff was qualified to perform her job duties for Defendant and satisfactorily performed them in accordance with Defendant's legitimate expectations. Ms. Offereins met or exceeded all performance expectations at Discover.

117.    Despite Ms. Offereins's lack of involvement in card issuance and, by extension, Project Simple, Discover determined that she forfeited $7,000,000 in equity awards. Discover did not do so for the similarly situated male executives who were responsible for card issuance.

118.    As referenced in this Complaint, direct stakeholders like Mr. Capozzi only received a reduced cash bonus of $150,000 for what was, on information and belief, a consequence for his involvement in the Project Simple investigation. Mr. Capozzi did not lose his equity awards in connection with the investigation. And while Mr. Hochschild even resigned from the Company over the card misclassification issue and other legal and compliance shortcomings, the Company

only cancelled one year of his equity awards and publicly announced that it did not exercise its clawback or forfeiture rights based on the Project Simple investigation.

119. The differential in pay between Ms. Offereins and male executives was not due to a bona fide seniority system, a bona fide merit system, or a bona fide system that measures employee earnings by quantity or quality of work, nor was the difference in pay a result of a factor other than gender. Rather, the differential was due to gender discrimination in violation of the EPA.

120. Discover deprived Ms. Offereins of the rights and privileges enjoyed by similarly situated male executives, and all of the benefits and privileges of her contractual relationship with Discover.

121. The discriminatory acts of Defendant, its agents, supervisors, managers, and owners were deliberate, intentional, wanton, and malicious, and were done with malice or with reckless indifference to Plaintiff's federally protected rights until the EPA. The acts complained of were ratified, authorized, or permitted by Defendant and its management, executives, and owners.

122. Defendant's unlawful conduct in violation of the EPA is outrageous and malicious, intended to injure Plaintiff, and has been done with conscious disregard of Plaintiff's rights under the EPA, entitling her to exemplary and/or punitive damages.

123. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the EPA as alleged herein, Plaintiff has suffered and continues to suffer emotional distress, severe mental anguish, humiliation, embarrassment, degradation, stress and anxiety, loss of self-esteem and self-confidence, pain and suffering, inconvenience, financial crisis, lost wages and benefits, future pecuniary losses and other consequential damages. Additionally,

Plaintiff has and will continue to incur attorneys' fees and costs of litigation as a direct and proximate result of the unlawful, discriminatory conduct as alleged herein.

### Count IV: Violation of the Age Discrimination in Employment Act of 1967

124.    Plaintiff incorporates Paragraphs 1-123 as though fully stated in this Paragraph.

125.    Under the ADEA, Plaintiff is a member of a protected class on the basis of Plaintiff's age. Ms. Offereins is 66 years old and is retired.

126.    While Ms. Offereins faced an astonishing $7,000,000 loss (now more than $8,000,000) shortly after retiring from what was a successful, trailblazing career, other executives who were not retired faced little to no punitive consequences for their proximity to Project Simple. Mr. Hochschild resigned from his role as CEO with only one year of cancelled equity awards. Discover noted that it had absolutely no intention of exercising its clawback or forfeiture provisions following the investigation. Other executives who were not retired received a reduced cash bonus or were offered handsome severance packages, with the latter resulting in no loss to equity awards and an additional two years of pay.

127.    While executives who were still employed with Discover faced minimal to no repercussions, Discover determined that it would be much more convenient to make an example of Ms. Offereins, even if she was well-removed from Company decision-making in her former role. By doing so, the Company believed it would skirt accountability and avoid a bureaucratic nightmare with executives who were not retired, while collecting substantial amounts of Ms. Offereins's unvested equity.

128.    By treating her differently than non-retired colleagues, Defendant has impermissibly used Ms. Offereins's status as a retired person as a proxy for her age, discriminating against her in violation of the ADEA. Defendant's stated basis for forfeiting Ms. Offereins's equity

awards was false and constituted a pretext for age discrimination.

129.    Defendant had a statutory duty to conduct and implement its compensation and benefits decisions in a nondiscriminatory manner without regard to age or retirement status as a proxy for age.

130.    Discover deprived Ms. Offereins of the rights and privileges enjoyed by similarly situated executives who were not retired, and all of the benefits and privileges of her contractual relationship with Discover.

131.    The discriminatory acts of Defendant, its agents, supervisors, managers, and owners were deliberate, intentional, wanton, and malicious, and were done with malice or with reckless indifference to Plaintiff's federally protected rights until the ADEA. The acts complained of were ratified, authorized, or permitted by Defendant and its management, executives, and owners.

132.    Defendant's unlawful conduct in violation of the ADEA is outrageous and malicious, intended to injure Plaintiff, and has been done with conscious disregard of Plaintiff's rights under ADEA, entitling her to exemplary and/or punitive damages.

133.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the ADEA as alleged herein, Plaintiff has suffered and continues to suffer emotional distress, severe mental anguish, humiliation, embarrassment, degradation, stress and anxiety, loss of self-esteem and self-confidence, pain and suffering, inconvenience, financial crisis, lost wages and benefits, future pecuniary losses and other consequential damages. Additionally, Plaintiff has and will continue to incur attorneys' fees and costs of litigation as a direct and proximate result of the unlawful, discriminatory conduct as alleged herein.

**Count V: Gender Discrimination in Violation of the Illinois Human Rights Act**

134.    Plaintiff incorporates Paragraphs 1-133 as though fully stated in this Paragraph.

135.    Under the IHRA, Plaintiff is a member of protected classes on the basis of gender. Ms. Offereins is a woman.

136.    Defendant has discriminated against Plaintiff because of her gender in violation of the IHRA.

137.    The effect of Defendant's discriminatory employment practices has been to deny Ms. Offereins equal employment opportunities, income in the form of wages, and other benefits of employment because of her gender.

138.    The discriminatory acts of Defendant, its agents, supervisors, managers, and owners were deliberate, intentional, wanton, and malicious, and were done with malice or with reckless indifference to Plaintiff's protected rights until the IHRA. The acts complained of were ratified, authorized, or permitted by Defendant and its management, executives, and owners.

139.    Defendant's unlawful conduct in violation of the IHRA is outrageous and malicious, intended to injure Plaintiff, and has been done with conscious disregard of Plaintiff's rights under the IHRA, entitling her to exemplary and/or punitive damages.

140.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the IHRA as alleged herein, Plaintiff has suffered and continues to suffer emotional distress, severe mental anguish, humiliation, embarrassment, degradation, stress and anxiety, loss of self-esteem and self-confidence, pain and suffering, inconvenience, financial crisis, lost wages and benefits, future pecuniary losses and other consequential damages. Additionally, Plaintiff has and will continue to incur attorneys' fees and costs of litigation as a direct and proximate result of the unlawful, discriminatory conduct as alleged herein.

**Count VI: Age Discrimination in Violation of the Illinois Human Rights Act**

141.     Plaintiff incorporates Paragraphs 1-140 as though fully stated in this Paragraph.

142.     Under the IHRA, Plaintiff is a member of protected classes on the basis of age. Ms. Offereins is 66 years old and is retired.

143.     Defendant has discriminated against Plaintiff because of her age in violation of the IHRA.

144.     The effect of Defendant's discriminatory employment practices has been to deny Ms. Offereins equal employment opportunities, income in the form of wages, and other benefits of employment because of her age.

145.     The discriminatory acts of Defendant, its agents, supervisors, managers, and owners were deliberate, intentional, wanton, and malicious, and were done with malice or with reckless indifference to Plaintiff's protected rights until the IHRA. The acts complained of were ratified, authorized, or permitted by Defendant and its management, executives, and owners.

146.     Defendant's unlawful conduct in violation of the IHRA is outrageous and malicious, intended to injure Plaintiff, and has been done with conscious disregard of Plaintiff's rights under the IHRA, entitling her to exemplary and/or punitive damages.

147.     As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the IHRA as alleged herein, Plaintiff has suffered and continues to suffer emotional distress, severe mental anguish, humiliation, embarrassment, degradation, stress and anxiety, loss of self-esteem and self-confidence, pain and suffering, inconvenience, financial crisis, lost wages and benefits, future pecuniary losses and other consequential damages. Additionally, Plaintiff has and will continue to incur attorneys' fees and costs of litigation as a direct and proximate result of the unlawful, discriminatory conduct as alleged herein.

## JURY DEMAND

Plaintiff requests a trial by jury on all claims triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant and requests that the Court:

    i.    Declare, decree, and adjudge that Defendant has violated Title VII, the EPA, the ADEA, and the IHRA;

    ii.    Grant a preliminary and permanent injunction against Defendant and its executives, agents, and managers from violating Title VII, the EPA, the ADEA, and the IHRA, and protecting Plaintiff;

    iii.    Enter appropriate injunctive relief against Defendant and its executives, agents, and managers to comply with Title VII, the EPA, the ADEA, and the IHRA and refrain from harassing, discriminating, and retaliating against Plaintiff and interfering with her rights and protections and awarding appropriate equitable relief;

    iv.    Award Plaintiff the equity awards and other employment benefits she was denied or lost;

    v.    Order Defendant to pay compensatory and punitive damages in an amount sufficient to punish Defendant for its past discrimination and to deter it from continuing with its discriminatory practices;

    vi.    Award pre-judgment and post-judgment interest;

    vii.    Award reasonable attorneys' fees and costs;

    viii.    Any further relief to which Plaintiff is entitled under Title VII, the EPA, the

ADEA, and the IHRA; and

ix.    Such other and further relief as this Court deems proper and just.

Dated: September 4, 2024                    Respectfully submitted,


                              /s/ Sean Hecker
                              Sean Hecker*
                              Julie E. Fink*
                              Andrew L. Chesley*
                              Jocelyn Hassel*
                              HECKER FINK LLP
                              350 Fifth Avenue, 63rd Floor
                              New York, New York 10118
                              (212) 763-0883
                              shecker@heckerfink.com
                              jfink@heckerfink.com
                              achesley@heckerfink.com
                              jhassel@heckerfink.com

                              Katherine Epstein*
                              HECKER FINK LLP
                              1050 K Street NW, Suite 1040
                              Washington, DC 20001
                              (212) 763-0883
                              kepstein@heckerfink.com


                              /s/ Stephen Chahn Lee
                              Stephen Chahn Lee
                              Law Office of Stephen Chahn Lee, LLC
                              209 S. LaSalle Street, Suite 950
                              Chicago, IL 60604
                              (312) 436-1790
                              slee@stephenleelaw.com

                              *Counsel for Diane Offereins*

                              *pro hac vice forthcoming*

33